RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0085p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────

ZURICH AMERICAN INSURANCE GROUP,

　　　　　　　　　　　　　　*Petitioner*,

*v.*

JOANNA DUNCAN, widow of and on behalf of
Raymond Duncan; DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS, UNITED STATES
DEPARTMENT OF LABOR,

　　　　　　　　　　　　　　*Respondents*.

No. 17-3625

───────────

On Petition for Review of an order of the Benefits
Review Board, United States Department of Labor.
Nos. 16-0327 BLA; 16-0358 BLA.

Decided and Filed: May 3, 2018

Before: MOORE, CLAY, and KETHLEDGE, Circuit Judges.

───────────

## COUNSEL

**ON BRIEF:** Cheryl Lynn Intravaia, FEIRICH/MAGER/GREEN/RYAN, Carbondale, Illinois,
for Petitioner. Gary K. Stearman, Ann Marie Scarpinio. UNITED STATES DEPARTMENT OF
LABOR, Washington, D.C., for Federal Respondent.

　　　　MOORE, J., delivered the opinion of the court in which CLAY, J., joined, and
KETHLEDGE, J., joined in the result. KETHLEDGE, J. (pp. 17–19), delivered a separate
opinion concurring in the judgment.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.  Raymond Duncan, a veteran of the U.S. Air Force, was born in 1947 and was a long-term resident of Middlesboro, Kentucky.  He worked in the coal-mining industry for over twenty years and developed severe respiratory issues. Raymond filed a claim for benefits under the Black Lung Benefits Act, but he died while his claim was still pending.  Raymond's claim was consolidated with a claim for survivor's benefits submitted by his widow, Joanna Duncan.  The administrative law judge ("ALJ") awarded benefits to Joanna, on both Raymond's behalf and as his surviving spouse.  The Benefits Review Board ("Board") affirmed.  Zurich American Insurance Group ("Zurich American"), the insurer of Straight Creek Coal Resources, now petitions this court to review the award.  For the following reasons, we **DENY** its petition.

## I.  BACKGROUND

### A.  Statutory and Legal Framework

The Black Lung Benefits Act ("BLBA"), 30 U.S.C. § 901 *et seq.*, provides benefits to coal miners who are totally disabled due to pneumoconiosis caused by prolonged exposure to coal dust.  Pneumoconiosis, commonly called black lung disease, is a "chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment."  30 U.S.C. § 902(b).  The BLBA's implementing regulations recognize two forms of pneumoconiosis:  clinical and legal.  *Brandywine Explosives & Supply v. Dir., Office of Workers' Comp. Programs*, 790 F.3d 657, 661 (6th Cir. 2015).  Clinical pneumoconiosis "consists of those diseases recognized by the medical community as pneumoconioses," 20 C.F.R. § 718.201(a)(1), whereas legal pneumoconiosis "includes any chronic lung disease or impairment and its sequelae arising out of coal mine employment," 20 C.F.R. § 718.201(a)(2). Federal regulations also recognize that pneumoconiosis—clinical and legal—is a "latent and progressive disease which may first become detectable only after the cessation of coal mine dust

exposure." 20 C.F.R. § 718.201(c); *Sunny Ridge Mining Co. v. Keathley*, 773 F.3d 734, 739 (6th Cir. 2014).

To establish entitlement to benefits under the BLBA, a person must show that (1) he or she is a miner (2) who suffers from pneumoconiosis (3) arising out of coal mine employment, which (4) contributes to (5) his or her total disability. 20 C.F.R. § 725.202(d); *Big Branch Res., Inc. v. Ogle*, 737 F.3d 1063, 1069 (6th Cir. 2013). If a miner was employed for at least fifteen years in "one or more underground coal mines," or "in a coal mine other than an underground mine" with "substantially similar" conditions to that of an underground mine, and "demonstrates the existence of a totally disabling respiratory or pulmonary impairment, then there shall be a rebuttable presumption that such miner is totally disabled due to pneumoconiosis, that his death was due to pneumoconiosis, or that at the time of his death he was totally disabled by pneumoconiosis."[1] 30 U.S.C. § 921(c)(4). "Thus, after a showing that the miner (1) was employed for at least fifteen years in underground coal mines [or in coal mines with "substantially similar" conditions] and (2) is totally disabled due to a respiratory or pulmonary impairment, then the rest of the elements outlined in 20 C.F.R. § 725.202(d) are presumed and the burden shifts to the employer to rebut them." *Ogle*, 737 F.3d at 1069. The employer may rebut the fifteen-year presumption by establishing that: "(1) the miner has neither clinical nor legal pneumoconiosis, or (2) the miner's respiratory or pulmonary impairment did not arise out of, or in connection with, employment in a coal mine." *Cent. Ohio Coal Co. v. Dir., Office of Workers' Comp. Programs*, 762 F.3d 483, 487 (6th Cir. 2014); 30 U.S.C. § 921(c)(4).

---

[1]This fifteen-year presumption was first added to the BLBA in 1972, but was revoked by Congress in 1981. *Brandywine Explosives & Supply*, 790 F.3d at 662 (first citing Black Lung Benefits Act of 1972, Pub. L. No. 92-303 § 4(c), 86 Stat. 150, 154 (1972); and then citing Black Lung Benefits Amendments of 1981, Pub. L. No. 97-119 § 202(b)(1), 95 Stat. 1635, 1644 (1981)). In 2010, Congress reinstated the presumption and made it "retroactive to claims filed after January 1, 2005 that were pending on or after March 23, 2010." *Id.* (citing Patient Protection and Affordable Care Act, Pub. L. No. 111-148 § 1556, 124 Stat. 119, 260 (2010)). In 2013, the Department of Labor promulgated a revised regulation with respect to the fifteen-year presumption. Regulations Implementing the Byrd Amendments to the Black Lung Benefits Act, 78 Fed. Reg. 59,102, 59,104–07 (2013); 20 C.F.R. § 718.305. This new regulation "applies to all cases that were pending when it was promulgated—whether before an ALJ, the Benefits Review Board, or our court." *Brandywine Explosives & Supply*, 790 F.3d at 662. Raymond filed his claim in May 2009, Pet'r App'x at A100–03 (Claim for Benefits), and therefore the fifteen-year presumption and the 2013 implementing regulations apply to this case.

**B. Factual History**

Raymond began working as an electrician in a strip mine in 1974, and worked in coal mines in a variety of occupations until 1999—except for a period between January 1992 and August 1993.  Pet'r App'x at A105 (Emp't Hist. at 1).  His last job in the coal industry was as a heavy-equipment operator and electrician for Straight Creek Coal at a coal preparation plant from 1998 to 1999.  *Id.*  In a handwritten letter, Raymond described working "under some of the worst condition[s] ever."  *Id.* at A219 (Duncan Oct 1, 2009 Ltr. at 1); *id.* at A41 (ALJ Dec. at 4).  Raymond explained his job responsibilities at Straight Creek Coal:  "I ran a dozer on a coal pile ten to twelve hours a day full of coal dust, shoveled spilt coal in tunnels three to four times a night, [and] helped clean tipples[2] full of coal dust."  *Id.* at A219 (Duncan Oct 1, 2009 Ltr. at 1); *id.* at A41 (ALJ Dec. at 4).  He wrote that "I've had to breathe coal dust all my work in the mines . . . ."  *Id.* at A219 (Duncan Oct 1, 2009 Ltr. at 1); *id.* at A41 (ALJ Dec. at 4).  Joanna, Raymond's widow and claimant in this case, testified that when Raymond came home from work he was so covered in dust that "you could only see the color of his eyes."  *Id.* at A85 (May 2, 2014 Hr'g Tr. at 11).  She said that she would have to wash his clothes "several times to even get them clean and they still wouldn't come clean."  *Id.*

Raymond, a non-smoker, suffered from severe respiratory problems.  *Id.*  Raymond explained:  "Right now [October 2009], I can't walk to the end of the street I live on without having to rest and catch my breath."  *Id.* at A219 (Duncan Oct 1, 2009 Ltr. at 1); *id.* at A41 (ALJ Dec. at 4).  Joanna testified that her husband's breathing "was awful" and "[h]e couldn't even go down the road without taking a breath.  We would go to the doctor's office and it would take us 30 minutes to get into the doctor's office because he had shortness of breath."  *Id.* at A85–86 (May 2, 2014 Hr'g Tr. at 11–12).  Raymond had to use a CPAP machine, oxygen, and a nebulizer.  *Id.* at A87 (May 2, 2014 Hr'g Tr. at 13).  Joanna testified that her husband had been diagnosed with pneumoconiosis, as well as non-alcoholic steatohepatitis potentially arising from exposure to chemicals in the mines.  *Id.* at A87–88 (May 2, 2014 Hr'g Tr. at 13–14).

---

[2]A "tipple" is "an apparatus by which loaded cars are emptied by tipping sometimes including an elevated runway or framework upon which the cars are run for tipping."  *Tipple*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (unabridged ed., rev. 2016).  Conditions at the tipple are apparently especially dusty.  *See Dir., Office of Workers' Comp. Programs v. Midland Coal Co.*, 855 F.2d 509, 512 (7th Cir. 1988).

Raymond died on August 29, 2011. *Id.* at A365 (Death Certificate). His causes of death were listed as cirrhosis, non-alcoholic steatohepatitis, obesity, and pneumoconiosis. *Id.*

## C. Procedural History

Raymond filed his claim for benefits on May 28, 2009. *Id.* at A100–03 (Claim for Benefits). On March 8, 2010, the District Director awarded benefits on Raymond's claim. *Id.* at A230–42 (Mar. 8, 2010 Proposed Dec. & Order). Zurich American—Straight Creek Coal's insurer—contested the Department of Labor's findings and requested a formal hearing before an ALJ. *Id.* at A187–88 (Identification of Potentially Liable Responsible Operator); *id.* at A243 (Mar. 13, 2010 Request for Hr'g).

Following Raymond's death in August 2011, Joanna filed a claim for survivor's benefits. *Id.* at A313–314 (Survivor's Claim for Benefits). The District Director subsequently awarded her benefits. *Id.* at A316–324 (Nov. 14, 2011 Proposed Dec. & Order). Zurich American contested the award of survivor's benefits, requested a formal hearing before an ALJ, and asked for the miner's and claimant's claims to be consolidated. *Id.* at A325–26 (Nov. 21, 2011 Request for Hr'g).

The ALJ held a hearing on May 2, 2014, at which Joanna testified. *Id.* at A74–96 (May 2, 2014 Hr'g Tr.). The ALJ issued a decision awarding benefits on March 30, 2016. *Id.* at A38–73 (ALJ Dec.). The ALJ concluded that: (1) Zurich American had not rebutted the presumption that Raymond had timely filed his claim for benefits; (2) Raymond "had over fifteen years of qualifying coal mine employment"; (3) because Raymond had over fifteen years of qualifying coal mine employment and Zurich American conceded that he was totally disabled due to a respiratory condition, the fifteen-year rebuttable presumption applied; (4) Zurich American had not rebutted this presumption; and (5) Joanna was entitled to benefits on behalf of Raymond from May 2009 to July 2011, and to survivor's benefits commencing in August 2011. *Id.* at A44, A46, A48, A68–71 (ALJ Dec. at 7, 9, 11, 31–34).

Zurich American appealed the ALJ's decision to the Board. *Id.* at A20 (Board Dec. at 2). Reviewing the ALJ's decision under the substantial-evidence standard, *id.* at A21 (Board Dec. at

3), the Board affirmed the award of benefits to the miner and the claimant, *id.* at A32–33 (Board Dec. at 14–15).  This petition for review followed.

## II.  DISCUSSION

### A.  Standard of Review

In black-lung-benefits cases, we review the decisions of the Board under a mixed standard.  "[W]e review the Board's legal conclusions de novo."  *Ogle*, 737 F.3d at 1068. "While we must affirm the Board's decision unless the Board has committed legal error or exceeded its scope of review, our review actually focuses on whether the ALJ's decision is supported by substantial evidence."  *Island Creek Ky. Mining v. Ramage*, 737 F.3d 1050, 1056 (6th Cir. 2013).  The ALJ must have correctly applied the germane law to reach a conclusion supported by substantial evidence.  *Id.*  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Ogle*, 737 F.3d at 1068–69 (quoting *Kolesar v. Youghiogheny & Ohio Coal Co.*, 760 F.2d 728, 729 (6th Cir. 1985)).  "In deciding whether the substantial evidence standard is satisfied, we consider whether the ALJ adequately explained the reasons for crediting certain testimony and documentary evidence over other testimony and documentary evidence."  *Cent. Ohio Coal Co.*, 762 F.3d at 488–89 (quoting *Greene v. King James Coal Mining, Inc.*, 575 F.3d 628, 634 (6th Cir. 2009)).  "'We do not reweigh the evidence or substitute our judgment for that of the ALJ'" and "[w]e will not reverse the ALJ's decision merely because 'we would have taken a different view of the evidence were we the trier of facts.'"  *Ramage*, 737 F.3d at 1056 (first quoting *Tenn. Consol. Coal Co. v. Kirk*, 264 F.3d 602, 606 (6th Cir. 2001), *superseded by regulation on other grounds as stated in Cumberland River Coal Co. v. Banks*, 690 F.3d 477 (6th Cir. 2012); and then quoting *Ramey v. Kentland Elkhorn Coal Corp.*, 755 F.3d 485, 486 (6th Cir. 1985)).

### B.  Timeliness of Miner's Claim

Zurich American first argues that the ALJ's finding that Raymond timely filed his BLBA claim was not supported by substantial evidence.  Miners seeking benefits under the BLBA must file their claims within three years of being informed of "a medical determination of total

disability due to pneumoconiosis." 30 U.S.C. § 932(f)(1); 20 C.F.R. § 725.308(a). There is "a rebuttable presumption that every claim for benefits is timely filed." 20 C.F.R. § 725.308(c).

Raymond filed his claim on May 28, 2009. Pet'r App'x at A100–03 (Claim for Benefits). Thus, to rebut the presumption of timeliness, Zurich American must show that a medical determination of total disability due to pneumoconiosis was communicated to Raymond prior to May 28, 2006. *Kirk*, 264 F.3d at 607. The ALJ found that Zurich American had not carried its burden in rebutting this presumption. Pet'r App'x at A44 (ALJ Dec. at 7).

Zurich American argues that Joanna's testimony is sufficient to rebut the presumption of timeliness. At the hearing, Joanna was unsure of when Raymond's doctors told him that he was totally disabled due to pneumoconiosis. Pet'r App'x at A94 (May 2, 2014 Hr'g Tr. at 20). She testified that he was informed prior to their marriage in 2009, but she guessed at several dates: 2000, 2004, and 2005. *Id.* at A92–94 (May 2, 2014 Hr'g Tr. at 18–20). When the ALJ further questioned Joanna about the date that Raymond learned of his total disability due to pneumoconiosis, she said she could only guess because "I don't know. I don't know the date." *Id.* at A94 (May 2, 2014 Hr'g Tr. at 20). The ALJ characterized Joanna's testimony about the timing as "equivocal at best." *Id.* at A43 (ALJ Dec. at 6).

The ALJ also reviewed Raymond's medical records, which Zurich American had cited to support its argument that Raymond's claim was untimely, and concluded that they did not help Zurich American satisfy its burden. *Id.* Treatment notes from the Mountain Home VA Medical Center dated March 17, 2003 and September 15, 2003 state that Raymond was disabled, but do not diagnose or specify the cause of that disability. *Id.* at A1263, A1450 (VAMC Notes at 169, 301). Raymond's treating physician, Dr. Moore, diagnosed him as totally disabled due to pneumoconiosis on April 12, 2011. *Id.* at A1470 (Dr. Moore Notes at 3) ("I had a long talk w[ith] this [patient] and I fell [sic] that in relationship to his pneumoconiosis, 22 years of coal mine dust exposure, I feel this [patient] is 100% disabled just w[ith] his pneumoconiosis. He has never smoked."); *see also id.* at A1468 (Dr. Moore Notes at 1) ("Also had a long talk w[ith] [patient] about pneumoconiosis.").

Zurich American argues that even if the ALJ relied on the latest date which Joanna mentioned—2005—this date falls outside of the three-year time limit, and thus Zurich-American satisfied its burden of rebutting the presumption of timeliness. This argument misunderstands the basis of the ALJ's decision. The ALJ, relying both on Joanna's explicit statements that she did not know when Raymond was informed of his total disability due to pneumoconiosis and on her equivocating testimony on this point, concluded that Joanna's testimony was not sufficient evidence to rebut the presumption of timeliness. Pet'r App'x at A43 (ALJ Dec. at 6). In other words, the ALJ credited none of the dates Joanna mentioned during her testimony, because she stated they were all guesses. The ALJ buttressed this conclusion by reviewing Raymond's medical records, which proved only that Raymond was informed of his total disability due to pneumoconiosis in 2011—two years after he filed his BLBA claim. *Id.* The ALJ's conclusion that Zurich American failed to rebut the presumption of timeliness is supported by substantial evidence.

## C.  Invocation of the Fifteen-Year Presumption

The ALJ found that Raymond had worked for at least fifteen years in qualifying employment, and Zurich American conceded that Raymond had a total respiratory disability. Thus, the ALJ concluded that the fifteen-year presumption in 30 U.S.C. § 921(c)(4) was established. Pet'r App'x at A48 (ALJ Dec. at 11). Zurich American contests the ALJ's finding that Raymond had fifteen years of qualifying employment.

Qualifying employment includes either work in an underground coal mine or "in a coal mine other than an underground mine" with "substantially similar" conditions to that of an underground mine. 30 U.S.C. § 921(c)(4). The statute does not define what "substantially similar" means. *See Dir., Office of Workers' Comp. Programs v. Midland Coal Co.*, 855 F.2d 509, 511 (7th Cir. 1988) (discussing a prior version of 30 U.S.C. § 921(c)(4) that contained the exact same language regarding "substantially similar" conditions). But in 2013 the Department of Labor promulgated a regulation defining the phrase: "The conditions in a mine other than an underground mine will be considered 'substantially similar' to those in an underground mine if the claimant demonstrates that the miner was regularly exposed to coal-mine dust while working there." 20 C.F.R. § 718.305(b)(2).

Raymond worked only in surface mines or coal-preparation plants during his career, so the ALJ relied on this regulation to determine whether Raymond's mining employment was "substantially similar" to underground mining.  Pet'r App'x at A45 (ALJ Dec. at 8).  Zurich American makes a two-pronged attack on the ALJ's application of § 718.305(b)(2).  First, it argues that the regulation is invalid on its face.  Second, it claims that, even if the regulation is valid, the ALJ's conclusion that Raymond was regularly exposed to coal-mine dust in the course of his employment at surface mines is not supported by sufficient evidence.

### 1.  Validity of 20 C.F.R. § 718.305(b)(2)

Zurich American concedes that this court has previously accepted and applied the regulatory definition in § 718.305(b)(2).  Pet'r Br. at 13 (citing *Cent. Ohio Coal Co.*, 762 F.3d at 489–90).  But it argues that this panel should overrule *Central Ohio Coal Co.*  We reject this argument summarily "because a later panel of the court cannot overrule the published decision of a prior panel . . . in the absence of en banc review or an intervening opinion on point by the Supreme Court."  *United States v. Lee*, 793 F.3d 680, 684 (6th Cir. 2015).

This court, however, has never squarely considered the merits of the argument that 20 C.F.R. § 718.305(b)(2) is invalid; in our cases discussing the regulation, the issue of the regulation's validity was waived.  *See Brandywine Explosives & Supply*, 790 F.3d at 663; *Cent. Ohio Coal Co.*, 762 F.3d at 489 n.2; *Premium Coal Co. v. Dir., Office of Workers' Comp. Programs*, 619 F. App'x 447, 450 (6th Cir. 2015).[3]  As Zurich American raised the validity of the regulation in front of the Board, Pet'r App'x at A25 (Board Dec. at 7), and both parties have briefed the question of the validity of the regulation, we take this opportunity to join the Tenth Circuit and hold explicitly that 20 C.F.R. § 718.305(b)(2) is a valid regulation.  *See Spring Creek Coal Co. v. McLean*, 881 F.3d 1211, 1219–23 (10th Cir. 2018).

---

[3]Zurich American does not attempt to distinguish our prior cases discussing 20 C.F.R. § 718.305(b)(2), but instead insists only that this panel overrule them.  We independently note that these cases did not address the validity of the regulation, but assumed the regulation was valid.  Thus, although Zurich American did not itself raise the argument that *Central Ohio Coal Co.* and its progeny do not control the outcome here, because both parties have briefed the argument about the validity of the regulation with "sufficient clarity and completeness" we will consider this issue on the merits.  *See Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1461 (6th Cir.), *cert. denied*, 488 U.S. 880 (1988).

Section 718.305(b)(2) was adopted after notice-and-comment rulemaking, Regulations Implementing the Byrd Amendments to the Black Lung Benefits Act, 78 Fed. Reg. 59,102 (2013), and therefore is analyzed under the two-step framework that the Supreme Court articulated in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *Ramage*, 737 F.3d at 1058. First, we ask "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc.*, 467 U.S. at 842–43. If, however, the intent of Congress is not clear, we move to *Chevron* step two and ask whether the agency's interpretation of a statutory provision is "reasonable." *Id.* at 843–44.

Zurich American attempts to argue that the statute's intent about the meaning of "substantially similar" is unambiguous, but it points to no authority explaining what Congress intended for this phrase to mean. "[W]e can discern no plain meaning of the requirement of 'substantial similarity.' Instead, immediately apparent is the fact that the Act does not specify whether a claimant must establish similarity to a particular underground mine, a hypothetical underground mine, the best, worst, or an average underground mine." *Midland Coal Co.*, 855 F.2d at 511. Because Congress's intent on this specific question is not clear, we move to *Chevron* step two. *See McLean*, 881 F.3d at 1222–23 (analyzing the validity of § 718.305(b)(2) under *Chevron*'s second step).

Under *Chevron* step two, "we may not disturb an agency rule unless it is arbitrary or capricious in substance, or manifestly contrary to the statute." *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 53 (2011) (internal quotation marks omitted). And we "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading [we] would have reached if the question initially had arisen in a judicial proceeding." *Chevron U.S.A. Inc.*, 847 U.S. at 843 n.11.

In promulgating § 718.305(b)(2), the Department of Labor adopted its "longstanding interpretation of the statutory presumption," *Cent. Ohio Coal Co.*, 762 F.3d at 489, which comported with the Seventh Circuit's position that what made a surface coal mine "substantially similar" to an underground coal mine for the purposes of the BLBA was the dusty working

conditions, *Midland Coal Co.*, 855 F.2d at 512. This is an eminently reasonable position. The BLBA was premised on the fact that "underground mines are dusty and that exposure to coal dust causes pneumoconiosis . . . ." *Id.* Logically, miners who are employed at surface coal mines and who are regularly exposed to coal dust face the same risks of developing pneumoconiosis as underground miners.[4] Thus, for a surface-coal miner to invoke the fifteen-year presumption, the claimant must adduce evidence "to show that the miner's duties regularly exposed him to coal mine dust, and thus that the miner's work conditions approximated those at an underground mine."[5] Regulations Implementing the Byrd Amendments to the Black Lung

---

[4]Zurich American attempts to argue that this syllogism fails because it is circular with the regulatory definition of "miner." Pet'r Br. at 13–14. It repeatedly cites 20 C.F.R. § 725.203 for this proposition in its opening brief, but this appears to be in error. Instead § 725.202 defines the term "miner." Zurich American argues that the special provisions concerning coal mine construction and transportation workers, located in 20 C.F.R. § 725.202(b), create the presumption that all miners are regularly exposed to coal dust and therefore make § 718.305(b)(2) redundant. This argument collapses multiple regulatory sections. Section 725.202(b) defines when a coal mine construction or transportation worker is considered a miner: They are a miner to the extent they are exposed to coal dust. This is consistent with the focus of the BLBA: exposure to coal dust. Underground-coal miners are presumed by Congress to be exposed to coal dust. *Midland Coal Co.*, 855 F.2d at 512. Their working conditions are the baseline to which others' working conditions are compared. Construction and transportation workers—who are not actually miners—are considered miners for the purposes of benefits under the BLBA to the extent their working conditions duplicate those of miners, i.e. regular exposure to coal dust. 20 C.F.R. § 725.202(b). And for a surface-coal miner to be entitled to the same fifteen-year presumption as an underground-coal miner, he or she must show regular exposure to coal dust. 20 C.F.R. § 718.305(b)(2). But the mere fact that the regulations allow construction and transportation workers to claim benefits to the extent their employment resembles that of miners does not mean the regulations automatically allow surface miners to take advantage of a presumption crafted for underground miners without a further evidentiary showing. In other words, these regulatory sections are addressing entirely different aspects of the BLBA.

[5]Zurich American claims that this comparison is contrary to the purposes of the statute. It is true that the Department of Labor has limited the scope of the comparison necessary to determine whether a surface mine has "substantially similar" conditions to those of an underground mine by directing the inquiry to whether the dust exposure is similar. But this narrowing is supported by the focus of the BLBA on dust as the key characteristic of working conditions in mines. *Midland Coal Co.*, 855 F.2d at 512. The Department concluded that it was unnecessary for each claimant to prove that regular exposure to dust is the defining characteristic of underground mines, but rather that fact is assumed. Regulations Implementing the Byrd Amendments to the Black Lung Benefits Act, 78 Fed. Reg. at 59,104–05. Thus, to prove similarity, the claimant has to adduce evidence showing that his or her employment at a surface mine led to the regular exposure to coal dust. *Id.* at 59,105. The responsible operator can then offer contrary evidence demonstrating that the working conditions did not include regular exposure to coal dust, and therefore there was no substantial similarity. *Id.* A simple analogy may elucidate the Department of Labor's approach. Imagine a chef wants to bake a peach pie to enter into a stone-fruit pie contest. She tells her sous-chef to go to the market and purchase peaches but, if peaches are unavailable, to purchase fruit that is "substantially similar." The sous-chef goes to the market and cannot find peaches. He then has to decide what the chef meant by "substantially similar" fruit. The sous-chef knows his boss is baking the pie to enter a stone-fruit pie contest. Thus, although peaches have many different characteristics that could be used as a point of comparison (i.e., color, flavor, texture, etc.), the sous-chef reasonably limits his search to only stone fruits. Put differently, his conclusion that fruit that is "substantially similar" to peaches are other stone fruits is a reasonable interpretation of the chef's requirements because the chef is baking to enter this contest. Here, the Department of Labor is the sous-

Benefits Act, 78 Fed. Reg. at 59,105. The Department of Labor included the modifier "regularly" in order "to clarify that a demonstration of sporadic or incidental exposure is not sufficient to meet the claimant's burden." *Id.*

Because the Department of Labor's detailed explanation "reasonably and persuasively indicates why the standard adopted in § 718.305(b)(2) is consistent with § 921(c)(4)'s 'substantial similarity' standard," *McLean*, 881 F.3d at 1222, we conclude that the Department's interpretation is entitled to *Chevron* deference. Consequently, we reject Zurich American's challenge to the validity of 20 C.F.R. § 718.305(b)(2).

### 2. Application of 20 C.F.R. § 718.305(b)(2)

Zurich American argues, in the alternative, that the ALJ's conclusion that Raymond was regularly exposed to coal dust during his employment at surface mines for a minimum of fifteen years is not supported by substantial evidence. We disagree.

In his employment history, Raymond indicated that he had worked at a mine and had been exposed to "dust, gases, or fumes" from 1974 to 1991 and again from 1993 until his retirement from coal mining in 1999. Pet'r App'x at A105 (Emp't Hist. at 1). Raymond wrote that "I've had to breathe coal dust all my work in the mines . . . ." *Id.* at A219 (Duncan Oct 1, 2009 Ltr. at 1); *id.* at A41 (ALJ Dec. at 4). The ALJ found that there was no "discernable reason to doubt the credibility" of Raymond's description of his working conditions. *Id.* at A46 (ALJ Dec. at 9).

The ALJ also noted that Raymond's narrative was supported by the treatment notes of his treating physician, Dr. Moore, as well as by Dr. Westerfield, a doctor whose expert opinion was proffered by Zurich American. *Id.* Dr. Westerfield noted that Raymond had an "adequate history of exposure to coal and rock dust from his work in surface mining and at the coal preparation plant to develop pneumoconiosis." *Id.* at A409–10 (Dr. Westerfield Op. at 5–6). Similarly, Dr. Moore noted that Raymond "was exposed to extremely high levels of dust his whole 22 years of work." *Id.* at A1468 (Dr. Moore Notes at 1). Finally, the ALJ stated that

---

chef to the Congressional chef, and has reasonably decided that regular exposure to coal dust is the key point of comparison that makes surface mining "substantially similar" to underground mining.

Joanna's testimony about Raymond's very dusty face and clothing when he returned from work buttressed the finding that Raymond was regularly exposed to coal dust during the last four years of his employment. *Id.* at A46 (ALJ Dec. at 9).

Zurich American's principal complaint about the ALJ's fact-finding appears to be that the evidence regarding Raymond's exposure to dust is anecdotal and neither he nor his widow provided evidence of "the actual dust conditions." Pet'r Br. at 24. But the Department of Labor has recognized that "a claimant's dust exposure evidence will be inherently anecdotal" because claimants "generally do not control . . . technical information about the mines in which the miner worked." Regulations Implementing the Byrd Amendments to the Black Lung Benefits Act, 78 Fed. Reg. at 59,105. The Department justified determinations of the degree of coal dust exposure based on anecdotal evidence on the underlying purposes of the fifteen-year presumption—to assist claimants in proving entitlement to benefits—and the fact that Congress has expressly allowed lay evidence to be considered in determining the validity of claims. *Id.* (citing 30 U.S.C. §§ 921(c)(4) & 923(b)).

Thus, we affirm the ALJ's determination that Raymond had at least fifteen years of qualifying employment. Therefore, Raymond had successfully invoked the fifteen-year presumption.

## D.  Rebuttal of the Fifteen-Year Presumption

The ALJ found that Zurich American failed to rebut the fifteen-year presumption because, although it demonstrated that Raymond did not have clinical pneumoconiosis, it failed to demonstrate that Raymond did not have legal pneumoconiosis that, in part, caused his total disability. Pet'r App'x at A70 (ALJ Dec. at 33). In front of both the Board and this court, Zurich American contests the ALJ's finding that it failed to establish Raymond did not have legal pneumoconiosis. *Id.* at A32 (Board Dec. at 14).

In determining whether Zurich American demonstrated that Raymond did not have legal pneumoconiosis, the ALJ considered the medical opinions of Drs. Baker, Westerfield, and Zaldivar, as well as the treatment notes of Raymond's treating physician, Dr. Moore. *Id.* at A51–68 (ALJ Dec. at 14–31). Dr. Baker concluded that Raymond had both clinical and legal

pneumoconiosis, *id.* at A151 (Dr. Baker Addendum), but the ALJ discounted his opinion because Dr. Baker did not have full access to Raymond's medical history when making his evaluation and it was unclear whether he was aware of Raymond's other serious medical problems, which could have contributed to his respiratory issues. *Id.* at A56 (ALJ Dec. at 19).

The ALJ also discounted Dr. Westerfield's conclusion that Raymond did not have legal pneumoconiosis because Dr. Westerfield repeatedly emphasized the time that elapsed between the end of Raymond's employment as a miner and the development of respiratory issues.[6] *Id.* at A57 (ALJ Dec. at 20); *id.* at A410, A412–13 (Dr. Westerfield Op. at 6, 8–9); *id.* at A470–71, A474 (Dr. Westerfield Dep. at 23–24, 27). This is an impermissible factor on which to render an opinion, because "[f]ederal regulations recognize pneumoconiosis, including legal pneumoconiosis, as a latent and progressive disease that may first become detectable after cessation of coal dust exposure." *Keathley*, 773 F.3d at 739; 20 C.F.R. § 718.201(c). When a doctor's conclusions are inconsistent with federal regulations, the ALJ can discount those conclusions. *See Banks*, 690 F.3d at 488.

Zurich American argues that the ALJ erred in discounting Dr. Westerfield's opinion, claiming that: (1) 20 C.F.R. § 718.201(c) applies only to clinical, and not legal, pneumoconiosis; and (2) there is no medical evidence that legal pneumoconiosis is a latent and progressive disease. Both arguments fail. First, contrary to Zurich American's claims, the regulatory recognition in 20 C.F.R. § 718.201(c) that pneumoconiosis is a latent and progressive disease applies to both clinical and legal pneumoconiosis. *Keathley*, 773 F.3d at 739. Second, the lack of medical evidence about legal pneumoconiosis is a feature, not a bug: "[l]egal pneumoconiosis is not medical pneumoconiosis; it is a legal fiction—long recognized by courts and later codified in regulations—designed to facilitate the remedial purposes of the Black Lung Benefits Act." *Id.* at 738.

After discounting the opinions of Drs. Baker and Westerfield, the ALJ considered the opinions of Drs. Zaldivar and Moore. Pet'r App'x at A67 (ALJ Dec. at 30). Dr. Zaldivar

---

[6]Dr. Westerfield was also incorrect in determining the amount of time that had elapsed, because he erroneously believed that Raymond had not worked in the coal industry since 1990, rather than 1999. *Compare* Pet'r App'x at A414 (Dr. Westerfield Op. at 10), *with id.* at A105 (Emp't Hist. at 1).

reviewed Raymond's medical records and concluded that he did not have legal pneumoconiosis, but rather that his respiratory problems were caused by his liver failure. *Id.* at A436 (Dr. Zaldivar Op. at 7); *id.* at A566, A571 (Dr. Zaldivar Dep. at 31, 36). In contrast, Dr. Moore—who was Raymond's treating physician from 2004 until the miner's death in 2011—repeatedly diagnosed Raymond with pneumoconiosis. *Id.* at A1468, A1470, A1476, A1479, A1482) (Dr. Moore Notes at 1, 3, 9, 12, 15). Dr. Moore also listed pneumoconiosis as a cause of death on Raymond's death certificate. *Id.* at A365 (Death Certificate). Because of Dr. Moore's extensive treatment history of Raymond, including multiple physical examinations, the ALJ gave his opinion controlling weight pursuant to 20 C.F.R. § 718.104(d)(5). *Id.* at A67 (ALJ Dec. at 30).

Considering the extensive level of detail with which the ALJ reviewed Raymond's medical history and the proffered medical opinions, and the rigor of the ALJ's explanations for crediting some evidence over other evidence, we conclude that the ALJ's determination that Zurich American failed to meet its burden of disproving legal pneumoconiosis is supported by substantial evidence. *Cent. Ohio Coal Co.*, 762 F.3d at 488–89 ("In deciding whether the substantial evidence standard is satisfied, we consider whether the ALJ adequately explained the reasons for crediting certain testimony and documentary evidence over other testimony and documentary evidence." (quoting *Greene*, 575 F.3d at 634)).

\* \* \*

The ALJ 's decision to award benefits to Raymond is supported by substantial evidence. Raymond timely filed his claim within three years of learning that he was totally disabled due to pneumoconiosis. He then established his entitlement to benefits by invoking the fifteen-year presumption in 30 U.S.C. § 921(c)(4). Zurich American failed to rebut this presumption.

**E.  Survivor's Claim**

After determining that Raymond was entitled to benefits, the ALJ concluded that Joanna was automatically entitled to benefits as his surviving spouse. 20 C.F.R. § 725.212. Zurich American did not separately challenge this award before the Board or before this court. Pet'r App'x at A33 (Board Dec. at 15). Therefore, we affirm the award of benefits to Joanna Duncan as Raymond's surviving spouse.

## III.  CONCLUSION

For the forgoing reasons, we **DENY** the petition for review.

---

**CONCURRING IN THE JUDGMENT**

---

KETHLEDGE, Circuit Judge, concurring in the judgment. Respectfully, I see no reason in this case to hand off the judicial power to an executive agency. Specifically, the phrase "substantially similar[,]" as used in 30 U.S.C. § 921(c)(4), is hardly so abstruse that we need an agency to interpret it for us.

By way of background, the Black Lung Benefits Act, 30 U.S.C. § 901 et seq., affords various benefits to coal miners who are totally disabled by pneumoconiosis, which the Act defines as "a chronic dust disease of the lung[.]" 30 U.S.C. § 902(b). The term "miner," in turn, "means any individual who works or has worked in or around a coal mine or coal preparation facility in the extraction or preparation of coal." 30 U.S.C. § 902(d). Those tasks undisputedly expose miners to coal dust. The term "miner" also includes anyone "who works or has worked in coal mine construction or transportation in or around a coal mine, to the extent such individual was exposed to coal dust as a result of such employment." *Id.* A common feature among miners under the Act, therefore, is exposure to coal dust.

Underground mining typically exposes miners to more dust than does mining aboveground. The provision at issue here thus draws a distinction between miners who work in "underground coal mines" and those who do not. That provision reads in relevant part:

> [I]f a miner was employed for fifteen years or more in one or more underground coal mines . . . and if other evidence demonstrates the existence of a totally disabling respiratory or pulmonary impairment, then there shall be a rebuttable presumption that such miner is totally disabled due to pneumoconiosis . . . . The Secretary shall not apply all or a portion of the requirement of this paragraph that the miner work in an underground mine where he determines that conditions of a miner's employment in a coal mine other than an underground mine were substantially similar to conditions in an underground mine.

30 U.S.C. § 921(c)(4). Thus, if a miner works underground for at least 15 years and later develops a totally disabling lung impairment, the miner is presumed to have pneumoconiosis (which is in turn presumed to have caused the impairment). Work done aboveground, however,

counts toward the presumption's 15-year requirement only if the conditions of the miner's employment "were substantially similar to conditions in an underground mine." *Id.*

Here, the majority says that the phrase "substantially similar" is ambiguous as used in § 921(c)(4). Yet that phrase is one that courts, lawyers, and laypeople use every day. "Similar" means "alike in substance or essentials[.]" *See, e.g.*, Webster's Third New International Dictionary 2120 (2002). Nobody contends otherwise. "Substantially," in the sense relevant here (*i.e.*, when used to describe degree rather than solidity) means "'considerable' or 'to a large degree.'" *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 196-97 (2002) (quoting Webster's Third New International Dictionary 2280 (1976)); *see also, e.g.*, The Oxford English Dictionary (online edition 2018) (defining "*substantially*" to mean "to a great extent or degree"). Again nobody contends otherwise. Thus, an ordinary citizen would readily understand that, for two things to be "substantially similar," they must largely share the same essential characteristics. Hence the meaning of that phrase is neither ambiguous nor vague, but straightforward and plain. And as used in § 921(c)(4) the phrase means simply that, to count toward the 15-year presumption, the conditions of a miner's work aboveground must largely share the essential characteristics of "conditions in an underground mine." 30 U.S.C. § 921(c)(4).

Nor is the essential characteristic of "conditions in an underground mine" hard to fathom for purposes of § 921(c)(4). Pneumoconiosis is "a chronic dust disease of the lung[.]" 30 U.S.C. § 902(b). The underground condition that matters, for purposes of a presumption about causation of that disease, is exposure to coal dust. Of course, every "miner" under the Act is "exposed to coal dust[.]" 30 U.S.C. § 902(d). Thus, as the agency itself correctly points out, a showing that "the miner was exposed to *any* coal-mine dust in non-underground coal mining" is not enough to show substantial similarity to underground conditions. 78 Fed. Reg. 59,102, 59,104 (Sept. 25, 2013) (emphasis added). Instead, the miner's exposure to coal dust must approximate that in an underground mine, where dust is relatively hard to escape because the mine is not open-air the way an aboveground mine is. Sporadic or intermittent exposure therefore is not enough; rather, to establish substantial similarity for purposes of § 921(c)(4), a

miner must show that exposure to coal dust was the rule rather than the exception during his aboveground work.

The agency's interpretation of § 921(c)(4) is no different than mine, since the agency would require an aboveground miner to show that he "was regularly exposed to coal-mine dust while working there." 20 C.F.R. § 718.305(b)(2). (One might say the two interpretations are substantially similar.) Indeed the agency's interpretation of § 921(c)(4) is both thoughtful and well-reasoned. For the narrow purpose of deciding this case, therefore, it makes little difference whether we agree with the agency's interpretation (as I do) or defer to it (as the majority does). For purposes of our constitutional separation of powers, however, it matters a great deal whether we exercise our Article III power to "'say what the law is,'" *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)), or instead hand over that power to an executive agency. True, in cases where the *Chevron* doctrine applies, the Supreme Court has told us we must hand over that power where the statute is ambiguous and the agency's interpretation is reasonable. *See Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-44 (1984). But we should not resign ourselves to that outcome before making every effort to discern for ourselves the statute's meaning. That meaning is easy enough to discern here, and so I concur only in the judgment.