NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0073n.06

No. 25-3200

## UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

**FILED**

Feb 04, 2026

KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| ISLAND CREEK KENTUCKY MINING, | ) | |
| Petitioner, | ) ) | ON PETITION FOR REVIEW OF AN ORDER OF THE BENEFITS REVIEW BOARD |
| v. | ) ) | |
| DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, U.S. DEPARTMENT OF LABOR; EDDIE L. STEWART, | ) ) ) ) ) | OPINION |
| Respondents. | ) ) | |

Before: CLAY, KETHLEDGE, and BUSH, Circuit Judges.

**CLAY, Circuit Judge.** Respondent Eddie Stewart filed a claim for benefits under the Black Lung Benefits Act (BLBA), 30 U.S.C. § 901 *et seq.*, against Petitioner Island Creek Kentucky Mining. An administrative law judge (ALJ) awarded benefits to him and the Benefits Review Board affirmed. Petitioner now petitions this Court for review of the Board's affirmance of the ALJ's award of benefits. For the reasons set forth below, we **DENY** the petition for review.

## I. BACKGROUND

### A. Statutory Background

Congress passed the BLBA to "provide[] benefits 'for or on behalf of [coal] miners who are totally disabled due to pneumoconiosis." *Island Creek Coal Co. v. Maynard ex rel. Maynard*, 87 F.4th 802, 807 (6th Cir. 2023) (quoting 20 C.F.R. § 718.204(a)). Pneumoconiosis is defined by statute as "a chronic dust disease of the lung and its sequelae, including respiratory and

pulmonary impairments, arising out of coal mine employment." 30 U.S.C. § 902(b). "The BLBA provides benefits based on two forms of pneumoconiosis: (1) clinical pneumoconiosis, and (2) legal pneumoconiosis." *Island Creek Coal Co.*, 87 F.4th at 807 (citing *Brandywine Explosives & Supply v. Dir., Off. of Workers' Comp. Programs*, 790 F.3d 657, 661 (6th Cir. 2015)). Clinical pneumoconiosis is defined by regulation as "those diseases recognized by the medical community as pneumoconioses." *Zurich Am. Ins. Grp v. Duncan ex rel. Duncan*, 889 F.3d 293, 296–97 (6th Cir. 2018) (quoting 20 C.F.R. § 718.201(a)(1)). Legal pneumoconiosis is defined by regulation as "any chronic lung disease or impairment and its sequelae arising out of coal mine employment." *Id.* at 297 (quoting 20 C.F.R. § 718.201(a)(2)).

"To establish entitlement to benefits under the BLBA, a claimant must prove that (1) they are a miner, (2) they have pneumoconiosis, (3) their pneumoconiosis arises out of coal mine employment, and (4) it contributes to (5) their total disability." *Island Creek Coal Co.*, 87 F.4th at 807; 20 C.F.R. § 725.202(d). "Because pneumoconiosis is 'latent and progressive,' miners may file a new claim 'even after the entry of a final order denying a previously filed claim.'" *Id.* at 808 (quoting *Cumberland River Coal Co. v. Banks*, 690 F.3d 477, 482 (6th Cir. 2012)); *see* 20 C.F.R. §§ 718.201(c), 725.309. "Subsequent claims, however, 'must be denied unless the miner demonstrates that one of the applicable conditions of entitlement . . . has changed since the date upon which the order denying the prior claim became final.'" *Island Creek Coal Co.*, 87 F.4th at 808 (quoting *Cumberland River Coal Co.*, 690 F.3d at 482); *see also* 20 C.F.R. § 725.309(d). "If a miner establishes a change in condition through new evidence, the ALJ then 'must consider all the evidence in the record—old and new—to determine whether the claimant is entitled to benefits. *Island Creek Coal Co.*, 87 F.4th at 808 (quoting *Cumberland River Coal Co.*, 690 F.3d at 482).

## B. Factual Background

Respondent Eddie Stewart is a former roof bolter who worked in underground coal mines for just under 15 years. He was last employed by the Island Creek Coal Company in 1989 and worked at the Providence Mine for 10 years. He worked eight-hour shifts for six, sometimes seven days a week. After working those shifts, Respondent was covered in dust, including some dust which blackened his face with a quarter-inch layer of residue. Dust regularly entered Respondent's eyes, ears, and nose, so much so that Respondent recalled blowing dust out of his nose after his shifts.

Around 2015 or 2016, Respondent struggled to breathe on his own. He continues to breathe with the assistance of an oxygen tank. He reports symptoms of coughing, shortness of breath, and a tight chest. Respondent's breathing issues have progressively gotten worse and have interfered with his ability to sleep. He experiences dizziness when standing without oxygen and can only walk approximately 50 ft with an oxygen tank. Respondent eventually left his job after he had a nervous breakdown and after the Providence Mine was shut down.

## C. Procedural History

Respondent Eddie Stewart filed his claim for benefits under the Black Lung Benefits Act on August 2, 2019. Respondent previously filed four other claims for benefits under the Act between June 12, 1996 and July 7, 2011. Each claim was denied, either because Respondent was found to not have pneumoconiosis or that he did have the disease but was not totally disabled by it.

The administrative law judge held a telephonic hearing on Respondent's claim on December 13, 2022. During the hearing, the parties presented evidence and argument before the ALJ, including medical expert reports by Drs. Sood, Sheikh, Selby, Majmudar, and Goodman.

Some of the evidence included the deposition testimony of Dr. Sanjay Chavda, who had treated Respondent's pneumoconiosis since 2019, and corresponding treatment records. The ALJ initially admitted the entirety of Dr. Chavda's deposition testimony into evidence.

In its May 31, 2023 order, the ALJ ultimately declined to consider portions of Dr. Chavda's cross-examination testimony which involved questions "about other medical evidence outside the four corners of [Dr. Chavda's] treatment notes." App., at 398 n.25. The ALJ justified this exclusion by finding that the employer's "asking Dr. Chavda to provide a medical opinion based on additional medical evidence exceeds the scope of cross-examination and constitutes an additional medical report that is in excess of the evidentiary limitations found at 20 C.F.R. § 725.414." *Id.* Accordingly, the ALJ "limit[ed] [its] review of Dr. Chavda's testimony to information regarding his treatment notes" only. *Id.*

The ALJ also considered Petitioner's smoking history. Though Respondent claimed to not smoke, he previously reported that he was smoking up to five or six cigarettes per day between the mid-1980s and 1995. The ALJ noted how Respondent's carboxyhemoglobin levels from his 2020 examination with Dr. Selby "were consistent with non-smoking status." *Id.* at 383. The ALJ thus concluded that Respondent likely "used four or five cigarettes per day for five to ten years, but likely no more than fifteen years from the early 1980s to the mid-1990s." *Id.* This finding, however, was not substantial to the ALJ.

After reviewing the evidence, the ALJ awarded benefits to Respondent. It found that "the preponderant weight of the medical evidence establishes that [Respondent] has clinical and legal pneumoconiosis, was totally disabled from a respiratory or pulmonary condition, and that his pneumoconiosis substantially contributed to his disabling pulmonary impairment." *Id.* at 420–21. This satisfactorily proved "a change in condition since the prior denial of benefits." *Id.* at 421.

Petitioner appealed to the Benefits Review Board, asserting that the ALJ "did not give it adequate notice that he would be excluding portions of Dr. Chavda's deposition from the record, did not identify the portions he was including or excluding, and erred in finding [Respondent] established pneumoconiosis." *Id.* at 427–28. The Board affirmed the ALJ, finding that the ALJ was not required to inform the parties that it was excluding evidence before deciding Respondent's case, any error from inadequate notice was harmless, the ALJ did identify the portions of Dr. Chavda's deposition it was excluding, and the ALJ did not err in finding that Respondent established his pneumoconiosis. Petitioner's timely petition for review followed.

## II.  DISCUSSION

### A.  Standard of Review

Our review of the Benefits Review Board is "limited to a determination whether the outcome below is supported by substantial evidence and was reached in conformance with applicable law." *Glen Coal Co. v. Seals*, 147 F.3d 502, 510 (6th Cir. 1998) (quoting *York v. Benefits Rev. Bd.*, 819 F.2d 134, 136 (6th Cir. 1987)). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Big Branch Res., Inc. v. Ogle*, 737 F.3d 1063, 1068–69 (6th Cir. 2013) (citation modified). "We do not reweigh the evidence or substitute our judgment for that of the ALJ." *S. Ohio Coal Co. v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab.*, 128 F.4th 809, 816 (6th Cir. 2025) (quoting *Island Creek Ky. Mining v. Ramage*, 737 F.3d 1050, 1056 (6th Cir. 2013)). We "must affirm the Board's decision if the Board has not committed any legal errors or exceeded its statutory scope of review of the ALJ's factual determinations." *Glen Coal Co.*, 147 F.3d at 510 (citing *Pyro Mining Co. v. Slaton*, 879 F.2d 187 (6th Cir. 1989)). We do have discretion to "affirm the decision of the Board on grounds other than those stated by the Board." *Id.* We review legal conclusions *de novo*.

*Apogee Coal Co., LLC v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab.*, 112 F.4th 343, 351 (6th Cir. 2024).

"The law requires the ALJ as trier of fact to determine whether the medical evidence before him is sufficiently documented and reasoned, and to weigh the evidence accordingly." *Incoal, Inc. v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab.*, 123 F.4th 808, 820 (6th Cir. 2024) (quoting *Grayson Coal & Stone Co., Inc. v. Teague*, 688 F. App'x 331, 336 (6th Cir. 2017)) (citation modified). "The ALJ's determination to credit or discredit medical opinions based on whether they are sufficiently documented and reasoned is a credibility matter that we must leave to the ALJ." *Id.* at 820–21 (quoting *Big Branch Res., Inc.*, 737 F.3d at 1073) (citation modified). "If the ALJ has adequately explained why he weighed the evidence as he did, then he has satisfied the substantial evidence standard." *Big Branch Res., Inc.*, 737 F.3d at 1069. "A remand or reversal is only appropriate when the ALJ fails to consider all of the evidence under the proper legal standard or there is insufficient evidence to support the ALJ's finding." *Id.* (quoting *McCain v. Dir., Off. of Workers Comp. Programs*, 58 F. App'x 184, 201 (6th Cir. 2003)).

## B. Analysis

### 1. The ALJ's Decision to Exclude Certain Evidence in Its Written Order

Petitioner first claims that the Board violated its due process rights when the Board held that the ALJ correctly applied *L.P. v. Amherst Coal Co.* (*Preston*), 24 Black Lung Rep. (Juris) 1-55 (Ben. Rev. Bd. 2008) (en banc) (per curiam) and that any such error was harmless. In *Preston*, the Board weighed "the role of the administrative law judge as gatekeeper of the record" with "the principles of fairness and administrative efficiency." *Preston*, 24 Black Lung Rep. (Juris), at 1-63. It thereby held that "if the administrative law judge determines that [regulatory] evidentiary limitations preclude the consideration of proffered evidence, the administrative law judge should

render his or her evidentiary rulings before issuing the Decision and Order." *Id.* The basis for this procedure is to allow the parties "the opportunity to make good cause arguments under [20 C.F.R. §] 725.456(b)(1), if necessary, or to otherwise resolve issues regarding the application of evidentiary limitations that may affect the administrative law judge's consideration of the elements of entitlement in the Decision and Order." *Id.*

"The Due Process Clause of the Fifth Amendment applies to administrative proceedings." *Karst Robbins Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 969 F.3d 316, 329 (6th Cir. 2020). "Under the procedural element of that clause, a party must be afforded adequate notice and a fair opportunity to be heard before being deprived of its property, in this case the benefits money owed to [Respondent]." *Id.* But even after procedural failure, Petitioner must still show that it was prejudiced by the error. *Id.*

We are not convinced that Petitioner did not receive adequate notice and a fair opportunity to raise good cause arguments under 20 C.F.R. § 725.456(b)(1) before the ALJ. Petitioner was on notice of the need to raise good cause arguments at the December 13, 2022 hearing. Petitioner knowingly submitted three physician opinions, including Dr. Chavda's deposition testimony, using the agency's "Evidence Summary Form." App., at 430. That form instructed Petitioner that testimony by a physician who did not prepare a prior medical report would be "considered a medical report of the party" that submitted it. *Id.* As such, Petitioner very likely knew that it had exceeded the two opinion limit set forth under 20 C.F.R. § 725.414 when it introduced Dr. Chavda's deposition testimony as evidence. Further, an ALJ is not "obligated *sua sponte* to conduct an independent assessment as to whether or not 'good cause' justified the admission of evidence in excess of the evidentiary limitations set forth at 20 C.F.R. § 725.414." *Brasher v. Pleasant View Mining Co.*, 23 Black Lung Reporter (Juris) 1-141 n.3 (Ben. Rev. Bd. 2006) (per

curiam). Against this backdrop, Petitioner was well positioned to raise good cause arguments before the ALJ at the December 13, 2022 hearing. But it did not, so we cannot say that Petitioner was deprived of a fair opportunity to present those arguments.

Finally, Petitioner passingly argues that the ALJ committed a "*Lane Hollow*" error by failing to identify which parts of Dr. Chavda's deposition it excluded from consideration. In *Lane Hollow Coal Company v. Director, Office of Workers' Compensation Programs, Department of Labor*, the Fourth Circuit held "[t]he [Administrative Procedure Act] requires an ALJ's opinion to contain his 'findings and conclusions, and the reasons or bases therefor, on all material issues of fact, law or discretion presented on the record.'" 137 F.3d 799, 802–03 (4th Cir. 1998) (quoting 5 U.S.C. § 557(c)(3)(A)). The result of this error, according to Petitioner, is that the ALJ's partial exclusion of Dr. Chavda's deposition "is both unclear and unable to be reviewed." Petitioner's Br., at 16.

We disagree. The ALJ identified which parts of Dr. Chavda's deposition it considered, and therefore kept in evidence, in its order. We are otherwise able to review the bases for the ALJ's findings and conclusions. Thus, the ALJ did not violate the Administrative Procedure Act when it did not describe in more detail the portions of Dr. Chavda's testimony it had excluded.

### 2. The ALJ Did Not Improperly Reference the Preamble to the 2001 Regulatory Revisions

Petitioner contends that the ALJ erred when it allegedly treated the Department of Labor's preamble to the 2001 regulation as a "binding presumption" in Respondent's case. To be sure, Petitioner is correct that "the preamble cannot 'bind' private parties" since it is merely an agency interpretive rule that is independent of agency legislative rules, which underwent notice and comment procedures. *Wilgar Land Co. v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab.*, 85 F.4th 828, 837–38 (6th Cir. 2023). "While a preamble's interpretation of regulations may

help clarify any ambiguity in them, an agency cannot use preambles to add substantive duties that the regulations themselves do not contain." *Id.* at 837.

Nonetheless, our precedents note the many different ways an ALJ may otherwise rely on interpretive rules like the preamble. First, ALJs may "look to the preamble . . . to clarify ambiguities in the regulation." *Id.* at 838. Next, "[ALJs] may rely on the preamble's statements of scientific fact when resolving evidentiary disputes in particular cases." *Id.* "A[n] [ALJ] may [therefore] assign more weight to an expert opinion that comports with the 'medical principles accepted by the' Department as compared to an expert opinion that conflicts with those principles." *Id.* (quoting *Lemarco, Inc. v. Helton*, 559 F. App'x 465, 468 (6th Cir. 2014)). This approach "allow[s] [ALJs] to treat the preamble as additional scientific 'evidence' in black-lung cases." *Id.* at 838–39.

Against this backdrop, the ALJ committed no error when it referred to the 2001 preamble in its order. The ALJ discusses the preamble thrice in its order. First, in its legal pneumoconiosis section, the ALJ reviewed the medical opinions of Drs. Majmudar, Sood, and Sheikh, who all physically examined Respondent or reviewed his medical records but did not consider Respondent's potential "smoking history in the 1980s and 1990s." App., at 401. The ALJ resolved this issue by finding that the smoking history was "minimal" and would not have changed these physicians' opinions. It then buttressed this conclusion with a reference to the preamble, noting that "the preamble also states that the deleterious effects of smoking and coal dust are not mutually exclusive," "the official Department of Labor position [is] that both coal dust and smoking cause obstructive impairment at approximately the same incidence," and smoking and coal dust exposure "create an additive risk of obstructive lung disease when combined." *Id.* at 401 & n.27. By relying on a statement of scientific fact found in the preamble to resolve an evidentiary issue, i.e., how to

square Drs. Majmudar, Sood, and Sheikh's expert opinions with Respondent's smoking history, the ALJ permissibly relied on the preamble in accordance with our precedents. *See Wiglar Land Co.*, 85 F.4th at 838.

The ALJ next references the preamble to further explain the persuasiveness of Drs. Majmudar, Sood, and Sheikh's opinions. The order describes how their opinions "are consistent with the position taken by the Department of Labor as outlined in the preamble to the regulations that coal dust exposure may induce obstructive lung disease even in the absence of fibrosis or complicated pneumoconiosis." *Id.* at 401. Thus, the ALJ simply "assign[ed] more weight" to expert opinions which were consistent with "medical principles accepted by the Department." *See Wiglar Land Co.*, 85 F.4th at 838.

Finally, the ALJ relies on the preamble when evaluating Dr. Chavda's treatment records of Respondent. The ALJ notes that Dr. Chavda's "assertion that [Respondent's COPD and hypoxemia] were due to [Respondent's] occupational exposure to dust is consistent with the position taken by the Department of Labor as outlined in the preamble to the regulations." The order lacks further explanation as to why this was the case or what position the ALJ had referred to. Nonetheless, it appears that the ALJ used the preamble to resolve certain evidentiary issues, just as it did with Drs. Majmudar, Sood, and Sheikh's opinions. The order references Dr. Chavda's unfamiliarity with Respondent's potential smoking history but concludes that any such actual smoking history would not discredit Dr. Chavda's treatment records. Accordingly, the ALJ did not treat the preamble as a binding presumption when the ALJ referenced it in the order.

### 3. The ALJ's Order Is Supported by Substantial Evidence

Finally, Petitioner challenges the ALJ's finding that Respondent had clinical pneumoconiosis. Petitioner raises three issues with the ALJ's conclusion: (1) the ALJ

impermissibly used the "counting heads" methodology to resolve a conflict among Respondent's x-ray scans; (2) the ALJ improperly weighed Respondent's computed tomography (CT) scan evidence to determine that Respondent had pneumoconiosis; and (3) the ALJ impermissibly determined that Respondent's potential smoking history would not have materially affected certain doctors' opinions. For the reasons discussed below, none of these arguments have merit.

### a. The ALJ Adequately Considered Respondent's Cumulative X-ray Evidence

Petitioner first claims that the ALJ impermissibly used the "counting heads" method to resolve a conflict among Respondent's chest x-ray scans. Put differently, Petitioner appears to argue that the ALJ simply noted that there were more chest x-ray scans indicating Respondent's clinical pneumoconiosis than not to conclude that the cumulative x-ray evidence supported finding that Respondent had clinical pneumoconiosis. To be sure, we have disapproved of such a mechanical resolution of conflicting x-ray evidence. *See Woodward v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab.*, 991 F.2d 314, 321 (6th Cir. 1993) ("Administrative factfinders simply cannot consider the quantity of evidence alone, without reference to a difference in the qualifications of the readers or without an examination of the party affiliation of the experts."). Nonetheless, ALJs may consider "mere[] quantitative differences" alongside "attendant qualitative evaluation[s] of the x-rays and their readers." *Id.*

Contrary to Petitioner's assertions, the ALJ followed this missive. In addition to noting each individual x-ray scan and accompanying interpretation, the ALJ considered the qualifications of the physicians who interpreted each x-ray scan. App., at 390–91 (noting the physician and qualification of each x-ray's interpretation); *id.* at 390–91 & n.21 (finding for each scan that the physicians who interpreted the scans were "equally qualified" because they were all "board certified radiologists and B-readers"). Accordingly, the ALJ did not err when it considered

Respondent's cumulative x-ray evidence to weigh in favor of finding Respondent's clinical pneumoconiosis.

Relatedly, Petitioner quibbles with the ALJ's determination that Respondent's March 11, 2020 and April 1, 2021 x-rays were "inconclusive." Petitioner claims that an ALJ may only qualify evidence using the descriptors "reliable," "probative," or "substantial" since the Administrative Procedure Act requires that an administrative order be issued "in accordance with the reliable, probative, and substantial evidence." 5 U.S.C. § 556. But we have never required ALJs to only use those adjectives when qualifying evidence to comply with § 556. Indeed, by determining that the March 11, 2020 and April 1, 2021 x-rays were "inconclusive," the ALJ opined on the probativeness of the x-rays—namely that they had little probative value. *See Inconclusive*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/inconclusive [https://perma.cc/8BYE-GBFA] (last visited Jan. 29, 2026) ("leading to no conclusion or definite result"). Thus, the ALJ did not violate the Administrative Procedure Act when it qualified some of Respondent's x-rays as "inconclusive."

### b. The ALJ Adequately Considered Respondent's CT Scan Evidence

Petitioner next contests the ALJ's weighing of Petitioner's chest CT scan evidence. Under 20 C.F.R. § 718.107(a), an ALJ may appropriately consider "[t]he results of any medically acceptable test or procedure reported by a physician and not addressed in this subpart, which tends to demonstrate the presence or absence of pneumoconiosis, the sequelae of pneumoconiosis or a respiratory or pulmonary impairment." Respondent underwent a chest CT scan on April 19, 2021. It was ordered by Dr. Chavda, Petitioner's treating physician, to test for Petitioner's potential "[c]oal workers' pneumoconiosis." App, at 64. Dr. Clark conducted the CT scan and reported "no significant hilar or mediastinal adenopathy," "atherosclerotic calcifications in [Petitioner's]

aorta and coronary vessels," "chronic appearing interstitial changes with patchy areas of interstitial and alveolar opacity, most pronounced in the perihilar regions and lower lobes," and "no pleural effusions or suspicious parenchymal nodules." *Id.* Dr. Clark's impressions were that the CT scan showed "[c]hronic appearing interstitial changes with no areas of acute consolidation" and "[m]oderate atherosclerotic calcifications in the aorta and coronary vessels." *Id.*

The parties then retained medical experts to interpret the results of the CT scan and submitted each expert's findings as evidence. Unsurprisingly, each expert concluded that the scan supported their client's positions. Respondent retained Dr. James Crum, who found that the scan "show[ed] bilateral subcentimeter pulmonary nodules both parenchymal as well as pleural-based"—a detail he found "[was] highly consistent with pneumoconiosis." *Id.* at 65. He concluded that his findings were "consistent with simple pneumoconiosis." *Id.* Petitioner retained Dr. Christopher Meyer, who found "no centrilobular or perilymphatic nodules," "no regions of conglomerate fibrosis," "no emphysema," "no pleural effusion or pleural plaque," and that Petitioner's "central airways are widely patent." *Id.* at 66. Dr. Meyer did find a "3 mm nodule" and "[a] calcified granuloma" in Petitioner's "right upper lobe." *Id.* In Petitioner's heart area, he noted a "nonspecific enlarged right hilar lymphadenopathy" and "moderate coronary artery calcification," but that Petitioner's "heart is not enlarged" and that "[t]here is no pericardial effusion." *Id.* He found "[n]o CT findings of coal workers' pneumoconiosis" and that the observed "[m]ultifocal ground-glass opacity" was due to pneumonia—potentially from past infection or drug use. *Id.*

The ALJ primarily relied on Dr. Clark's findings since the scan and report were part of Respondent's ongoing medical treatment and the findings were corroborated by Dr. Crum's report. The order discredited Dr. Meyer's report because the ALJ attributed "the changes in

[Respondent's] lungs" to "etiologies . . . not identified by [Dr. Clark] who read the scan" and because Dr. Meyer did not explain why he did not view coal mine dust "as a possible etiology for the changes." *Id.* at 393. Thus, the order concluded "that the CT scan evidence supports a finding of clinical pneumoconiosis." *Id.*

Petitioner claims the ALJ's conclusion is flawed for three reasons. First, Petitioner claims the ALJ wrongly interpreted Dr. Clark's report. In particular, Petitioner avers that the report did not diagnose or conclude anything about Respondent's condition. Any reference to pneumoconiosis, according to Petitioner, is actually because Dr. Chavda requested that Respondent be tested for Coal miner's pneumoconiosis. Second, Petitioner argues the ALJ ignored a discrepancy between Dr. Clark's and Dr. Crum's findings, namely that Dr. Clark found changes mostly in Respondent's lower lobes whereas Dr. Crum found changes primarily in Respondent's upper lungs. Third, Petitioner claims that the ALJ ignored the fact that Dr. Meyer was more experienced in interpreting CT scans than Dr. Crum.

None of Petitioner's arguments are persuasive. As discussed, Dr. Clark's report not only stated why Respondent underwent a chest CT scan (the "clinical indication") but lists Dr. Clark's conclusions. The ALJ determined that, in light of Respondent's clinical indication for "coal workers' pneumoconiosis," Dr. Clark and Dr. Crum's conclusions supported a finding of pneumoconiosis. The ALJ acted within his discretion in making that determination. And we cannot say, on this record, that the ALJ misunderstood the term "clinical indication" on Dr. Clark's report.

Next, the ALJ did not ignore the aforementioned discrepancy between Drs. Clark and Crum's reports. Indeed, the ALJ explicitly mentioned in its order how Dr. Clark identified changes

mostly in Respondent's lower lobes and how Dr. Crum found changes mostly in Respondent's upper lungs. These differences were apparently of no moment to the ALJ's conclusion.

Finally, the ALJ did not need to review the credentials or expertise of the interpreting doctors when it weighed the credibility of the doctors' findings. Unlike with x-ray evidence, ALJs are not required by regulation to consider the certifications or qualifications of the interpretating physicians. *Compare* 20 C.F.R. § 718.102(e)(2) (x-rays) *with* 20 C.F.R. § 718.107 (other medical evidence). Petitioner's argument therefore asks us to revisit the ALJ's credibility determinations of the doctors' interpretations of the at-issue CT scan. We decline to do so. After all, an ALJ's "determinations to credit or discredit . . . medical opinions based on whether they are sufficiently documented and reasoned is a credibility matter that we must leave to the ALJ." *Big Branch Res., Inc.*, 737 F.3d at 1073.

### c. The ALJ Adequately Explained Its Weighing of the Relevant Doctors' Opinion or Treatment Evidence

Petitioner next contends that the ALJ erred when it credited Drs. Sood, Chavda, Majmudar, and Sheikh's opinions or treatment records because these doctors were not aware of Respondent's smoking history. Petitioner's argument, however, is a bit misleading because Drs. Selby and Goodman were also unaware of Respondent's smoking history. Nonetheless, we have never held that an ALJ must completely discredit a doctor's opinion because it was partially based on inaccurate background information. To the contrary, an "ALJ is not required to totally discount a doctor's opinion just because it relied on imprecise information so long as the ALJ acknowledges the discrepancy and adequately explains why the opinion is nevertheless entitled to greater weight than others in the record." *Huscoal, Inc. v. Dir., Off. of Workers' Comp. Programs*, 48 F.4th 480, 491–92 (6th Cir. 2022); *Wolf Creek Collieries v. Dir., Off. of Workers' Comp. Programs*, 298 F.3d 511, 516–17, 522–23 (6th Cir. 2002) (affirming ALJ's crediting of doctor's opinion where the

opinion attributed "a smoking history of approximately five years" to the miner but the "evidence establish[ed] a smoking history of about 50 years" because there was substantial evidence to support the ALJ's decision); *see also Jericol Mining, Inc. v. Napier*, 301 F.3d 703, 713 (6th Cir. 2002) (affirming the ALJ's crediting of doctors' opinions which were "not based solely on . . . x-ray evidence" the ALJ had discredited). We have otherwise approved of an ALJ's wholesale discrediting of a doctor's opinion where the opinion exclusively relied on unreliable or inaccurate information. *See Greene v. King James Coal Mining, Inc.*, 575 F.3d 628, 635 (6th Cir. 2009) (affirming ALJ's discrediting of a doctor's opinion where it "[found] serious flaws in the two stated bases for [the doctor's] pneumoconiosis diagnosis.").

The ALJ did not err when it credited Drs. Sood, Chavda, Majmudar, and Sheikh's opinions or treatment record evidence. Though these doctors did not know about Respondent's smoking history, the ALJ sufficiently explained how other evidence in the record supported their conclusions of Respondent's clinical pneumoconiosis. Dr. Sood did not interview or examine Respondent and relied on only a part of Respondent's personal and medical history, but the ALJ noted how Dr. Sood's review of and conclusions from Respondent's x-ray scans tracked the ALJ's conclusions from those scans. Dr. Chavda's treatment records, as the ALJ explains in its order, were well supported by his routine treatment of Respondent from 2019 and the ALJ's conclusions from Respondent's x-ray and CT scans. Dr. Majmudar's opinion was likewise supported by his physical examination of Respondent, his review of Respondent's medical records, and Defendant's x-ray and CT scans. Dr. Sheikh interviewed and examined Respondent and reviewed Respondent's April 1, 2021 chest x-ray scan, which Dr. Sheikh opined was suggestive of coal worker's pneumoconiosis. The ALJ explained that Dr. Sheikh's findings were sufficiently

corroborated by Dr. Crum's interpretation of the April 1, 2021 chest x-ray and the cumulative chest x-ray evidence.

Petitioner also disagrees with the ALJ's discrediting of Drs. Selby and Goodman's opinion evidence. Dr. Selby was able to physically examine Respondent and review some of Respondent's background and medical history. From this review, Dr. Selby did not diagnose Respondent with pneumoconiosis, opining that Respondent's breathing problems were instead due to "uncontrolled and poorly treated asthma." App., at 10. Dr. Goodman reviewed some of Respondent's medical records, x-ray scans, and other doctors' reports. Dr. Goodman heavily discounted other doctors' interpretations of Respondent's March 2020 x-ray scans which found signs of pneumoconiosis because Dr. Goodman opined that the scan was so "grossly abnormal" that some abnormalities should have been detected in Respondent's 2011 chest scans. App., at 59. But no such abnormalities were detected in 2011, so Dr. Goodman concluded that the detected abnormalities in Respondent's scans could not be due to pneumoconiosis.

Drs. Selby and Goodman's opinions were unpersuasive to the ALJ because they were contradicted by Respondent's x-ray data. The ALJ explained that Dr. Selby's opinion was not credible because it was contradicted by "the weight of the x-ray evidence overall." *Id.* at 396. Dr. Goodman's opinion fared no better. The ALJ noted how Dr. Goodman did not review Respondent's most recent x-ray and interpretations of the x-ray and was therefore "not well-documented or well-reasoned." *Id.* at 397. These explanations suffice since, as discussed above, the ALJ's conclusions as to Petitioner's x-ray evidence is supported by the record.

The ALJ adequately explained why he weighed each respective doctor's opinion in coming to his conclusion that Respondent had clinical pneumoconiosis. We therefore find that the ALJ's order is supported by substantial evidence. *See Big Branch Res., Inc.*, 737 F.3d at 1068.

### III. CONCLUSION

For the reasons set forth above, we **DENY** the petition for review.